LAURA TAYLOR SWAIN, United States District Judge
Before the Court is an urgent motion, filed on October 26, 2017, by the Financial Oversight and Management Board for Puerto Rico (the "FOMB," or the "Oversight Board"), seeking entry of an order confirming the appointment and authority of a Chief Transformation Officer ("CTO") for the debtor Puerto Rico Electric Power Authority ("PREPA") (docket entry[2] no. 361 (the "Motion") ). This Court has jurisdiction of this matter pursuant to 48 U.S.C. § 2166(a).
The FOMB seeks court confirmation of its appointment of Noel Zamot as CTO of PREPA with all the powers of a chief executive officer, reporting to the FOMB. (Motion ¶ 4.) The FOMB asserts that a PREPA CTO is necessary in the wake of Hurricane Maria, particularly given the historical challenges that have "degraded [PREPA's] financial and operating condition" over the last several years. (Motion ¶¶ 18-25.) The Ad Hoc Group of PREPA Bondholders (the "Ad Hoc Group"), the National Public Finance Guarantee Corporation ("National"), Scotiabank de Puerto Rico ("Scotiabank"), the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF"), U.S. Bank National Association ("U.S. Bank"), the PREPA Governing Board ("Governing Board"), Assured Guaranty Corp. ("Assured"), and Syncora Guarantee Inc. ("Syncora") (collectively, the "Opposing Parties") oppose the FOMB's Motion. The Instituto de Competitividad y Sostenibilidad Economica de Puerto Rico ("ISCE") has filed papers in support of the appointment of a CTO, and the Puerto Rico Energy Commission ("PREC") has filed comments to the Motion raising broader policy coordination issues.
The Court heard oral argument on the Motion on November 13, 2017 (the "November 13th Hearing"). The Court has carefully reviewed and considered all of the submissions made in connection with this Motion, including the arguments presented at the November 13th Hearing and, for the following reasons, the Motion is denied. This Opinion and Order memorializes and expands upon the brief oral ruling delivered by the Court at the close of the November 13th Hearing.
BACKGROUND
PREPA is an instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth," or "Puerto Rico") created pursuant to the laws of Puerto Rico. See Puerto Rico Electric Power Authority Act, *630 22 L.P.R.A. §§ 191 - 218. Under Commonwealth law, PREPA's operations are overseen by the PREPA Governing Board, a group of nine individuals, six of whom are appointed by the Governor of Puerto Rico. 22 L.P.R.A. § 194. The PREPA Governing Board is empowered to appoint an Executive Director who is responsible for the "general supervision" of PREPA's operations and employees. See id.
The proposed CTO would essentially displace the PREPA Executive Director and Governing Board by assuming "management and control of the business and affairs of PREPA." (Docket entry no. 414-1, ¶ 3.) Among other powers and duties, the CTO would have the power to sign all PREPA contracts; supervise and direct all PREPA employees; develop and implement a power restoration plan; finalize and implement an industry modernization strategy for the power sector; oversee the administration of federal funds; and revise and implement the PREPA fiscal plan. (Id. ¶¶ 3-4.) The CTO would be compensated by, and report directly to, the FOMB. (Id. ¶¶ 6-7.) Under the FOMB's proposal, PREPA's Executive Director would be required to report to the CTO, bypassing the PREPA Governing Board and the Governor. (Id. ¶ 8.) The FOMB-appointed CTO's tenure would last until the effective date of a confirmed plan of adjustment for PREPA. (Id. ¶ 9.)
The FOMB contends that the broad powers granted to it by the Puerto Rico Oversight, Management, and Economic Stability Act, 48 U.S.C. §§ 2101 - 2241 ("PROMESA"), necessarily subsume the power to act as a "chief executive officer" overseeing both long term strategic planning and day-to-day management of PREPA. (Docket entry no. 413 (the "Reply"), ¶ 2.) The FOMB argues that, collectively, PROMESA Titles I and II, along with sections 301(c)(7), 305, and 315 of the statute, bestow upon the FOMB "quintessential managerial, business, and executive" powers that allow it to direct any activities incidental to the execution of certified fiscal plans, approved budgets and, ultimately, a plan of adjustment. (Reply ¶¶ 18-33.) The Opposing Parties assert that nothing in PROMESA gives the FOMB the power to insert a CTO into PREPA's organizational structure. Several Opposing Parties have also proposed alternative and ancillary relief. (See, e.g., docket entry no. 376, at 10-13; docket entry no. 377, at 15-20; docket entry no. 379, ¶¶ 4-7, 16; docket entry no. 390, ¶ 2.) The FOMB argues that these additional requests are procedurally improper and should accordingly be denied.
DISCUSSION
The issue at the heart of the FOMB's Motion is whether PROMESA grants the FOMB authority to unilaterally displace a statutorily-created management structure and direct the executive functions of a Title III debtor-in this case, PREPA. The Court notes that this is an issue of first impression, and that there is no provision of Commonwealth law authorizing the creation of a PREPA CTO, and no explicit provision in PROMESA for such a position. Any power to take over direct management of PREPA through a CTO in the context of these PROMESA Title III proceedings must, therefore, be implied from the express provisions of PROMESA Titles I, II, and/or III. For the following reasons, the Court finds no basis for such a broad power in any of the provisions relied upon by the FOMB as authority for its appointment of the CTO.
PROMESA Titles I and II
In the absence of a direct provision permitting the FOMB to create new territorial governance structures or redefine existing ones, the FOMB argues that *631 PROMESA indirectly grants it "many broad powers" that "render[ ] it impossible for any entity other than the Oversight Board to exercise the powers of a chief executive officer without the Oversight Board's consent." (Reply ¶ 2.) Among other things, the FOMB points out that it has the power to develop and certify its own fiscal plans and budgets under PROMESA sections 201(d)(2), 201(e)(2), and 202(e)(4); the power to make certain budget reductions under section 203(d); and the power to review new legislation for compliance with the certified fiscal plan under section 204(a). The FOMB further asserts that it has the power to "control all old and new contracts," which is "tantamount to the power to control virtually everything PREPA does," under PROMESA section 204(b)(2) and section 365 of the Bankruptcy Code, which is incorporated by PROMESA section 301(a); the power to "install an agent to obtain ... every piece of information PREPA possesses" under PROMESA section 104(c); the power to incur and control all old and new PREPA debt under section 207; and the power to "[b]ar the Governor and Legislature from enacting and enforcing any law" that the Oversight Board determines is contrary to the purposes of PROMESA under section 108(a)(2).[3] (See Reply ¶¶ 2, 5, 12, 19-21, Appendix C.) The FOMB asserts that, taken together, these provisions lead to the inescapable conclusion that it has broad executive and managerial authority over PREPA's operations and organizational structure, which empowers the FOMB to appoint a CTO. However, when read carefully and in the context of the statute as a whole, none of the Title I and II provisions cited by the FOMB provides it with the authority it claims here.
The primary mechanism through which fiscal plans and instrumentality budgets are developed under PROMESA sections 201 and 202 looks first to the territorial government, not the FOMB, for origination and refinement. While the FOMB can certify its own fiscal plan and budget under certain circumstances, it may only do so after an interactive process with the territorial government does not yield a plan or budget that is acceptable to the FOMB. See PROMESA § 201(d)(2) (allowing the FOMB to develop a fiscal plan only "if the Governor fails to submit" an acceptable plan within the time specified by the FOMB); id. § 202(e)(4) (allowing the FOMB to develop an instrumentality budget only "[i]f the Governor fails to develop an Instrumentality Budget that is a compliant budget by the day before the first day of the fiscal year"). If the FOMB develops and certifies its own fiscal plan and/or budget under these circumstances, the Commonwealth's government is deemed to have accepted the FOMB's plan or budget. See id. §§ 201(e)(2); 202(e)(3).
Even though the FOMB is empowered to monitor and enforce compliance with the instrumentality's certified budget or *632 fiscal plan under PROMESA section 203, responsibility rests in the first instance with the territorial government to prepare reports and respond to requests for information from the FOMB. See id. §§ 203(b), 203(c). The power to make budget reductions arises only after the Governor has failed to correct an inconsistency identified by the FOMB between the Commonwealth's projected and actual performance in relation to a previously-certified budget. See id. § 203(d). The FOMB's power under PROMESA section 204 to review new legislation and executive acts is likewise tied to the Commonwealth government's initial responsibility to present certifications as to lack of significant inconsistency with the approved fiscal plan, and to respond to requests by the Oversight Board for information and explanation. See id. § 204(a)(5) (permitting the FOMB to act to ensure that the enactment or enforcement of new legislation will not adversely affect compliance with the fiscal plan only "[i]f the territorial government fails to comply with a direction given by the Oversight Board to" provide a missing estimate or certification, or correct a significant inconsistency).
Similarly, the FOMB's negative power to review contracts under section 204(b) is limited to "certain contracts," and is granted to enable the FOMB to ensure that those contracts "promote market competition and are not inconsistent with the approved [f]iscal [p]lan." Id. § 204(b)(2). By denying approval, the FOMB can prevent the Commonwealth or an instrumentality from going forward with a proposed course of action, but nothing in section 204(b) affirmatively grants the FOMB the power to "control virtually everything PREPA does." (See Reply ¶ 5.)[4] The Court need not attempt to map the boundaries of the FOMB's contracting-related power at this juncture, but the plain language of section 204(b) makes clear that it cannot be read to reach any and all contracts. Although the FOMB could conceivably use its power under section 204(b) to create bureaucratic obstacles to hobble PREPA's day-to-day functions, such actions would be irresponsible in this Court's view, and would be directly contrary to the sense of Congress expressed in section 204(b)(3). See PROMESA § 204(b)(3) ("[A]ny policies established by the Oversight Board ... should be designed to make the government contracting process more effective, to increase the public's faith in this process, to make appropriate use of the Oversight Board's time and resources, to make the territorial government a facilitator and not a competitor to private enterprise, and to avoid creating any additional bureaucratic obstacles to efficient contracting.").
Similar principles animate the PROMESA provisions defining the FOMB's powerful role in the development and certification of fiscal plans and budgets under PROMESA sections 201 and 202. These foundational documents provide blueprints for revenues, expenses, debt, and capital resources, and they are used to substantiate methods for responsible financial management. The FOMB's authority to withhold approval and to make recommendations clearly gives it significant leverage to guide and to cabin the expectations of the Commonwealth entities responsible for proposing and refining the plans and budgets. But nothing in the fiscal plan, budgeting, and enforcement provisions of PROMESA sections 201, 202, 203, and 204 suggests that the FOMB is the principal body empowered *633 to manage PREPA's day-to-day functions, or that it has direct authority to alter PREPA's reporting structure and install a CTO. Although the FOMB's fiscal plan and budgeting powers give it a strong and substantially determinative voice in overall strategy regarding the Commonwealth's revenues, expenses, and general direction for responsible financial management, they do not imply that the FOMB's role includes detailed operational planning or direct executive authority over the implementation of those plans and budgets.
This distinction is borne out in other provisions of PROMESA, which limit the FOMB's authority to exercise the type of plenary executive power it asserts in the instant Motion. For example, PROMESA authorizes the Governor, and not the FOMB, to initiate disciplinary action against territorial officers for intentionally reporting false or misleading information. See PROMESA § 104(l). Likewise, PROMESA authorizes the FOMB to make "recommendations" to the territorial government on matters relating, inter alia, to the "the structural relationship of departments, agencies, and independent agencies within the territorial government." Id. § 205(a)(2). If such recommendations are made, the Commonwealth's government can reject them after providing an explanation to the FOMB, the President, and Congress. Id. § 205(b).[5]
The degree of unilateral power that Congress has granted to the FOMB stands in contrast to the powers Congress granted to the District of Columbia Financial Control Board (the "D.C. Board") under the District of Columbia Financial Responsibility and Management Assistance Act of 1995. The D.C. Board was empowered, for example, to essentially declare significantly inconsistent legislative acts null and void unilaterally, and to pre-review every contract the D.C. government proposed to execute. In drafting PROMESA section 204, Congress declined to include such provisions. See H.R. Rep. No. 114-602, at 111 (2016) ("[PROMESA] establishes a board that is robust but reasonable. Its powers are far less potent than the powers the Congress conferred upon the board that it established for the District of Columbia in Public Law 104-8...."); id. at 113 ("An earlier version of PROMESA ... required the oversight board to review every legislative act enacted by the Puerto Rico government and to make a determination-in the board's sole discretion-about whether each act was consistent with the certified fiscal plan .... [I]f the board determined that the act was significantly inconsistent with the fiscal plan, the board was required to declare the act "null and void." This was essentially the procedure in place for the District of Columbia under Public Law 104-8...."); id. at 114 ("Section 204(b) authorizes-but does not require-the board to establish a policy to review certain contracts .... [c]ompare this to Public Law 104-8... which authorized the oversight board to pre-review every contract proposed to be executed by the District of Columbia government."). Congress also forewent provisions that would have allowed a Congressionally-created entity to *634 appoint an emergency manager with all the powers of a board of directors for any territorial public corporation whose expenditures exceeded its revenues for at least two consecutive years. See S. 2381, 114th Cong. § 322(a)(5) (2016). Instead, Congress created a PROMESA Oversight Board with significant leverage in the form of guidance, gatekeeping, and enabling powers that would in essence provide guardrails for the territorial government on its journey to fiscal credibility and responsibility. Congress did not grant the FOMB the power to supplant, bypass, or replace the Commonwealth's elected leaders and their appointees in the exercise of their managerial duties whenever the Oversight Board might deem such a change expedient. See H.R. Rep. No. 114-602, at 112 (2016) ("[T]he oversight board ... will provide guardrails for the Puerto Rico government, but will not supplant or replace the territory's elected leaders, who will retain primary control over budgeting and fiscal policymaking."). Indeed, the only reference to a chief executive in PROMESA is in the statute's definition of the office of Governor. See PROMESA § 5(12).
The remaining provisions cited by the FOMB do not create a framework empowering the FOMB to exercise the broad, chief executive role the FOMB claims in its Motion. The power to access information under PROMESA section 104(c) does not imply a grant of managerial authority. To the contrary, section 104(c) recognizes the separate institutional existence of instrumentalities like PREPA, and requires their leadership to grant the FOMB's requests for access. See id. § 104(c)(2) ("The head of the entity of the territorial government responsible shall provide the Oversight Board with such information and assistance (including granting the Oversight Board direct access to automated or other information systems) as the Oversight Board requires under this paragraph."). Nothing in section 104(c) authorizes the FOMB's unilateral takeover of management and information systems, or sanctions FOMB-directed changes in PREPA's command structure.
The same is true of PROMESA section 207, which requires the territorial government to obtain the FOMB's consent prior to issuing new debt or entering into certain transactions with respect to its debt. See id. § 207. The plain language of section 207 does not suggest that the FOMB can alter the management and reporting structure of PREPA. It may well be that the FOMB finds itself in a position to incentivize the Commonwealth or its instrumentalities to agree to operational measures they dislike in order to gain the FOMB's consent, but such leverage is not tantamount to a grant of chief executive officer status.
The FOMB also relies on PROMESA section 108(a), which preserves the autonomy of the FOMB by prohibiting the Governor and Legislature from exercising control over the FOMB, or enacting rules and policies that would impair or defeat the purposes of PROMESA. See id. § 108(a). Section 108(a) serves as a restraint on territorial officials, but it does not provide an affirmative grant of authority to the FOMB to take any and all actions it believes are necessary to further its role under PROMESA. Nor, contrary to the Oversight Board's argument that the government lacks standing even to object to the FOMB's Motion, does section 108 prevent the Governor from participating in the instant motion practice and seeking court determinations regarding the FOMB's authority under PROMESA.
*635 PROMESA Title III
The FOMB's assertion that Title III creates or reinforces direct managerial power granted by Titles I and II rings hollow as well. PROMESA section 303 reserves the territory's political and governmental powers to the territory or "any territorial instrumentality thereof," subject only to Titles I and II. See id. § 303.[6] As the Court has explained, nothing in Titles I and II permits the FOMB to displace local government structures and authority by declaration. Similarly, sections 305 and 306 do not empower the FOMB to interfere unilaterally with the debtor's political and governmental powers, or with the debtor's property or revenues. Section 306 is a jurisdictional provision, and does not confer any powers on the FOMB. See id. § 306. Section 305 restrains territorial government concessions of authority or property without the FOMB's consent, and serves as a defense against third party invasions of the same. See id. § 305. It does not authorize the FOMB to interfere proactively with PREPA's governance structure.
The FOMB also invokes its PROMESA status as a trustee and debtor representative under Title III as sources of implied operational management authority. However, the language and context of Title III make it clear that the trustee and representative status provided to the FOMB by Title III are granted in relation to the Bankruptcy Code provisions specifically adopted by PROMESA, and are conferred for the purpose of the prosecution of the Title III proceedings. They are not stand-alone grants of executive operational authority.
Section 301(c)(7) of PROMESA provides that references to the term "trustee," as used in Bankruptcy Code provisions incorporated into PROMESA, are to be read as references to the FOMB with one exception that is not relevant here. The Title III powers granted to the FOMB are powers of a trustee arising from a debtor-creditor relationship in the exercise of structuring its debts. Although a trustee in bankruptcy may exercise certain fiscal powers, the FOMB's status as a trustee under PROMESA does not collapse management of the debtor's affairs with management of the Title III proceeding. Notably, Congress did not make the FOMB an operating trustee by incorporating section 1104 of the Bankruptcy Code. See PROMESA § 301(a). Nor did Congress incorporate Bankruptcy Code section 1107, which pertains to a debtor in possession, or section 1108, which authorizes the trustee to operate the debtor's business. See 11 U.S.C. §§ 1107, 1108. By only selectively incorporating certain chapter 11 provisions, Congress gave neither the FOMB nor the territorial debtor acting alone the full range of authority of a chapter 11 debtor in possession. Rather, Congress chose to grant the FOMB more limited trustee *636 powers, which are nonetheless crucial to the achievement of readjustment. For instance, the FOMB is empowered to assume and reject contracts, avoid certain obligations, and enter into credit arrangements. See 11 U.S.C. §§ 365, 506(c), 544, 545, 547, 548 549(a), made applicable by PROMESA § 301(a). PROMESA requires a debtor to work alongside the FOMB and divides the debtor's authority by putting key restructuring tools in the hands of the FOMB, while preserving the elected government's operational control and voice in management and strategic decisions.
PROMESA's grant of trustee status to the FOMB thus does not empower the FOMB to sweep the elected government aside. That is not to say that the FOMB's Title III powers are not pivotal. The FOMB is the only entity that can propose a plan of adjustment and exercise certain fiscal powers within the Title III proceeding. See PROMESA §§ 301(a), 312(a). A feasible plan of adjustment must, however, be premised on a functioning and credible government structure that will execute the plan of adjustment long after the FOMB is dissolved. That is doubtless one reason that PROMESA leaves the elected government in place and does not suspend it in favor of direct management by the FOMB.
Section 315(a) of PROMESA authorizes the FOMB to take actions necessary to prosecute the debtor's case. These actions include: filing a petition under PROMESA section 304, submitting or modifying a plan of adjustment under sections 312 and 313, or otherwise generally submitting filings in relation to the case. See id. § 315(a). These enumerated actions do not imply a general power to manage PREPA's daily operations, or alter its management and reporting structure. Section 315(b), which denominates the Oversight Board as representative of the debtor in the Title III, grants the FOMB authority to speak and act for the debtor in the Title III debt adjustment process. But the title of representative does not, by itself, necessarily implicate the power to control the debtor's operations. Since Titles I to III, read in their totality, do not implicate such authority either, the FOMB's reliance on its "representative" status as a source of ultimate executive authority is unavailing.
Based on its careful review of PROMESA, and after consideration of the parties' arguments, the Court finds that there is no express provision within PROMESA and its incorporated Bankruptcy Code provisions, nor any inferential grant of power, that authorizes the FOMB to impose changes in structure or reporting lines within PREPA by appointing a CTO, or to exercise the authority of a chief executive officer, much less to delegate that authority to an agent of the FOMB. The structure established by Titles I and II, alongside the reservation of territorial power in section 303, requires the FOMB and the territorial government to work together to establish a fiscally responsible path forward that is acceptable to the FOMB. Congress might have chosen to make the FOMB's job easier in the short term by granting it direct control and disabling the Commonwealth government's ability to dissent, but it did not do so. Congress deliberately divided responsibility and authority between the two.
It is notable here that the FOMB has not asserted that PREPA is non-compliant with a certified fiscal plan or budget. The post-hurricane fiscal plan and budgeting process were only recently announced by the FOMB, on October 31, 2017. PREPA's proposal is due on December 22, 2017, with certification or recommendations by the *637 FOMB to be made by January 12, 2018. But serious collaborative work, drawing upon all available wisdom and expertise, cannot await this timetable. Every day and every minute counts for American citizens who are living in darkness and danger on the island. At this crucial juncture, the FOMB and the government must work together respectfully, candidly, and cooperatively within their roles, as defined by Commonwealth law and by PROMESA, to earn the confidence of outside funding sources and to forge informal consensus on a path forward that may then be embodied in a fiscal plan and budget. These duties are solemn ones, and are critical for the residents of Puerto Rico, creditors, insurers, government agencies, and contractors involved in the reconstruction process, and for the prospects of these Title III proceedings and the future of Puerto Rico itself.
With talented individuals working in good faith on both sides, the joint structure created by PROMESA is one that can create sound, long-lasting change in which all can have confidence going forward. That is the challenge and the expectation. The power sharing structure created by PROMESA is also fraught with the potential for mutual sabotage. The FOMB could repeatedly stymie plans proposed by the government, disapprove contracts, deny access to credit, and invoke myriad other barriers to progress. Territorial authorities could provoke such actions by acting irresponsibly or by refusing to adopt sensible recommendations that might not have been the first choice for those in local government, but which can, through work with the FOMB, garner outside government and market support. And, while section 108 of PROMESA does not preclude the government from pushing back and seeking court determinations regarding the FOMB's interpretations of PROMESA, every moment spent in complicated and expensive litigation is a moment lost for attention to the future of Puerto Rico and her people. These negative possibilities should motivate the parties to work together, quickly, for positive change.
Requests for Alternative Relief
The Court denies the various requests made by the Opposing Parties to appoint other forms of emergency managers and co-managers. These requests have not properly been raised by motion practice, and the Court need not, and does not, address their pertinence or merits. See In re W.R. Grace & Co., 2008 WL 4571559, at *1 n.2, 2008 Bankr. LEXIS 2532, at *2 n.2 (Bankr. D. Del. Oct. 10, 2008) ("Requests for affirmative relief cannot be combined with a response to a motion."); Fed. R. Bank. P. 9014 ("In a contested matter not otherwise governed by these rules, relief shall be requested by motion, and reasonable notice and opportunity for hearing shall be afforded the party against whom relief is sought.").
CONCLUSION
For the foregoing reasons, the FOMB's Motion is denied in its entirety. This order resolves docket entry no. 361.
SO ORDERED.

All docket entries refer to case no. 17 BK 4780, unless otherwise specified.

The FOMB further cites its express power under PROMESA section 104(h) to enforce certain specific anti-strike and anti-lockout provisions of existing Commonwealth labor laws, PROMESA section 104(k)'s grant of authority to "seek judicial enforcement of [the FOMB's] authority to carry out its responsibilities under this Act," and its powers to: issue subpoenas under section 104(f); enter into contracts to carry out its responsibilities under section 104(g); investigate selling and disclosure practices under section 104(o); institute hiring freezes under section 203(d)(2)(B)(i); and review certain rules and regulations for compliance with the FOMB's policies under section 204(b)(5). (See Reply ¶¶ 2. 12, 19-21, Appendix C.) The Court reaches the same conclusions as to the import of these provisions individually and collectively as it does with respect to the provisions of Titles I and II discussed in the text.

Similarly, the power to assume or reject executory contracts on the debtor's behalf with the Court's approval under Bankruptcy Code section 365 does not give the FOMB absolute control over all of PREPA's actions. See 11 U.S.C. § 365.

The FOMB argues that section 201(b)(1)(K) of PROMESA, which provides that a fiscal plan "shall" adopt "appropriate recommendations submitted by the Oversight Board under section 205(a)," effectively permits it to override an objection by the Commonwealth by incorporating any and all recommendations into its own fiscal plan. The statutory structure is ambiguous in this regard, particularly in its use of the qualifier "appropriate." It is unnecessary for the Court to resolve this issue at this juncture, since there is no fiscal plan in place that even purports to require a restructuring of management and reporting authority within PREPA.

To the extent that the FOMB argues that PREPA does not exercise political or governmental power covered by section 303, the Court finds the FOMB's position inconsistent with the plain language of PROMESA. Section 5(19) of PROMESA broadly defines a territorial instrumentality as "any political subdivision, public agency, instrumentality-including any instrumentality that is also a bank-or public corporation of a territory, and this term should be broadly construed to effectuate the purposes of this Act." PROMESA § 5(19). The Riefkohl case cited by the FOMB, which dealt with Eleventh Amendment immunity, does not support the FOMB's argument, and in fact affirmatively characterizes PREPA as a governmental agency maintained to carry out public purposes. See Riefkohl v. Alvarado, 749 F.Supp. 374, 375 (D.P.R. 1990) ("That PREPA has at its core a public objective cannot be denied.").